

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ NOV 09 2011 ★

**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ANNMARIE SCOPPETTONE,

                 Plaintiff,

       -against-

MAMMA LOMBARDI'S PIZZICO, INC.,
d/b/a VILLA LOMBARDI'S, OCG, INC.,
d/b/a VILLA LOMBARDI'S,

                 Defendant.
--------------------------------------------------------X

<u>MEMORANDUM & ORDER</u>
09-CV-440 (TCP) (WDW)

PLATT, District Judge.

      Pending is Defendant's Motion for Summary Judgment filed pursuant to Federal Rule of

Civil Procedure 56(b). For the reasons discussed below, Defendant's motion is **GRANTED** as to

Plaintiff's Federal law claims.

**BACKGROUND**

**A.    Parties**

      The plaintiff is Annmarie Scoppettone ("Plaintiff"), who resides in Suffolk County. Pl.'s

Third Am. Compl. ¶ 6. The defendant is Mamma Lombardi's Pizzico, Inc. ("Defendant"), a

business in Holbrook, Suffolk County. *Id.* at ¶ 8.

**B.    Facts**

Defendant hired Plaintiff, then 17-years old, in January 2008 to work as a buffet attendant. Pl.'s Third Am. Compl. ¶¶ 17-18. Plaintiff alleges she "was subjected to various forms of sexual harassment" during her employment at Defendant's business. *Id.* at ¶ 20. Plaintiff asserts that Zach Will and Alex Lopez sexually assaulted her during the course of her employment.[1]

In June 2008, Zack Will sexually assaulted Plaintiff. *Id.* at ¶ 21. According to Plaintiff, Plaintiff was working in Defendant's walk-in freezer when Will entered "the freezer, approached [Plaintiff] . . . and removed his penis from his pants, thrust his hips toward [Plaintiff], grabbed her hair, and forced her head toward his exposed penis." Pl.'s Third Am. Compl. ¶¶ 21-22. Plaintiff fought off Will's attacks and left the freezer. *Id.* at ¶ 22. Later that night, Will drove Plaintiff to her home after their shift ended. *See id.* at ¶ 23. During the car ride, Will removed his penis from his pants and demanded Plaintiff "perform oral sex on him whilst he drove." *Id.* at ¶ 24. On a date after these events, Plaintiff complained to a co-worker about Will's harassments. *Id.* at ¶ 25. In July 2008, Plaintiff alleges that Will "continued his sexually charged advances toward Plaintiff" by sending text messages to, and flirting with, Plaintiff. *Id.* at ¶¶ 26-27.

Plaintiff alleges further that, in October 2008, Will stated, in front of Plaintiff's co-workers, that Will " 'did not know Plaintiff had that much of an ass' ", though Plaintiff concedes Defendant did not have knowledge of any harassment until Defendant was told on October 22, 2008. *See id.* at ¶ 29; *see also* Pl.'s Dep. 244:17-24, March 15, 2011 ("Do you believe that

---

1 Plaintiff's Third Amended Complaint includes alleged events, which are "meant to be an illustrative, and not exhaustive, list of Defendant's discriminatory acts." Pl.'s Third Am. Compl. at n.1. Plaintiff filed a letter with the "exhaustive list" on October 24, 2011, in response to this Court's Order, dated October 19, 2011, to produce such a list. Pl.'s Letter, ECF No. 92. This letter included one additional allegation against three porters who worked at Defendant's business. Pl.'s Letter at 3. *See infra* n.15 for discussion of this additional alleged discriminatory act.

2

[Defendant] knew about Zach Will's alleged behavior towards you [before October 22, 2008]? . . . No, I don't believe that they knew.").

Plaintiff claims Will was her immediate supervisor and trainer. Pl.'s Third Am. Compl. ¶ 21. Defendant asserts Will was not Plaintiff's supervisor; instead, Will "was a waiter, and Buffet Attendant at the time of the incident" and had no supervisory power over Plaintiff. *See, e.g.*, Def.'s R. 56.1 Stmt. ¶¶ 103, 106.

As noted *supra*, besides Will, another employee of Defendant, Alex Lopez, subjected Plaintiff to sexual assaults. *Id.* at ¶ 30. In September 2008, Lopez "led Plaintiff to a large, dark, and empty room." *Id.* at ¶ 32. When Plaintiff began to walk out, Loped "grabbed Plaintiff's wrists and pulled her into an abandoned room [where he] began to hug, kiss, and grope Plaintiff [and] touched Plaintiff's breasts and vaginal area." *Id.* at ¶ 34. Plaintiff, eventually, escaped. *Id.* Immediately after, Plaintiff told a co-worker about the incident. *Id.* at ¶ 35. Lopez, allegedly, continued to leer at Plaintiff and would "grind his penis up against Plaintiff when he walked by her, yet demanded she not tell management." *Id.* at ¶ 36. Feeling she had no one else with whom to discuss all of these incidents, Plaintiff informed one of her school's guidance counselors. *Id.* at ¶ 37. Plaintiff did not inform Defendant about the Will incidents or Lopez incidents until October 24, 2008. *See* Pl.'s Dep., 183:24-184:3.

Plaintiff alleges that "[a]s a result of Defendant's discriminatory actions, and her complaints of unlawful sexual harassment and [Defendant's] corresponding failure to take remedial action," Defendant "constructively discharged" Plaintiff. Pl.'s Third Am. Compl. ¶ 38. Plaintiff alleges she was discriminated against because of her gender and that she was retaliated against due to her complaints. *Id.* at ¶ 40. Further, Plaintiff alleges Defendant failed to compensate Plaintiff for the October 2, 2008 and October 9, 2008 pay periods. *Id.* at ¶ 45. In a letter dated February 10, 2009, Defendant advised Plaintiff that Defendant had changed banks in

October 2009 (the same time period Plaintiff did not receive her paychecks). *See* Hayden Decl. Supp. Def.'s Mot. Summ. J., Ex. K [hereinafter *Reimbursement Letter*]. Attached to the letter were checks for both of the above-referenced pay periods and a $24 check to compensate Plaintiff for bank fees related to the original bounced checks. *Id.*

At the time of these events, Defendant had a comprehensive policy in place that prohibited gender discrimination and sexual harassment. The policy provided several avenues through which possibly-aggrieved employees might complain, including the directive—found in a staff memorandum from Defendant's Director of Human Resources and the "Acts of Gross Misconduct" section of the employee manual—that "[a]ny employee who feels that he or she has been subjected to sexual harassment should immediately report the matter to their Supervisor, the Human Resources Department, or one of the Owners." *See* Hayden Decl., Ex. A at 2 and 3, respectively. Plaintiff signed a statement acknowledging having read the manual. *See id.* at 1.

Finally, "Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission and [brought] this suit within ninety (90) days of the receipt of a Notice of Right to Sue." Pl.'s Third Am. Compl. ¶ 15; *see also id.* at Ex. A.

## C.    Causes-of-action

Plaintiff brings Federal and State statutory claims for: (1) failure to pay minimum wage, (2) gender discrimination, and (3) retaliation. Additionally, Plaintiff brings a State common law claim for constructive discharge. *See* Pl.'s Third Am. Compl. ¶¶ 47-88.[2]

---

[2] In her Third Amended Complaint, Plaintiff brought additional State common law claims against Zach Will: (1) aiding and abetting and (2) intentional infliction of emotional distress. Pl.'s Third Am. Compl. ¶¶ 80-88. Zach Will was removed as a defendant, however, by Stipulation of Dismissal and this Court's confirming Order. *See* ECF Nos. 67 and 68, respectively. Those claims, therefore, are not considered.

## DISCUSSION

### A.    Standard for Summary Judgment

Defendant's motion for summary judgment may not be granted unless the Court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). "Summary judgment may be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.' " *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). The Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir. 1998).

"A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). "[T]he judge's function [in reviewing a motion for summary judgment] is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

The Supreme Court has held that, when opposing parties' versions of events differ substantially, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' " *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**B.     Fair Labor Standards Act ("FLSA") Claim**

**a.     Standard**

> In any action . . . to recover unpaid minimum wages . . . or liquidated damages, under the [FLSA] . . . if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

Fair Labor Standards Act, 29 U.S.C. § 290 (2010).

"To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act to comply with them.' " *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999); *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)).

**b.     Motion Granted**

Defendant's motion, as to the FLSA claim, is granted. Defendant paid Plaintiff for the October 2, 2008 and October 9, 2008 pay-periods. *See Reimbursement Letter.* As noted *supra* 3-4, on February 10, 2009, Defendant mailed pay-checks for those pay-periods as well as a $24 check to compensate Plaintiff for bank fees related to the bounced checks. *Id.* Further, Plaintiff

6

admitted that she is no longer owed any money for unpaid wages. *See* Pl.'s Dep., 210:24 – 211:5 ("Do you believe [Defendant] owes you any other money at this point in time for wages? No.").

As to the FLSA good faith exception clause, Defendant's letter to Plaintiff states that Defendant changed banks around the time when Plaintiff stopped working for Defendant. *Reimbursement Letter*. The Reimbursement Letter includes an internal memorandum, dated October 30, 2008, which advised Defendant's employees of the bank change. *Id.* at 5. Additionally, as Defendant notes, Plaintiff did not attempt to deposit the checks until two months after they were received – well after the time that the bank had changed banks. Def.'s Reply Mem. Supp. Mot. Summ. J. 4; *see also Reimbursement Letter* 3-4.[3] As the Reimbursement Letter states, when Defendant was alerted to the fact that Plaintiff had not received her earned wages, Defendant sent the checks to Plaintiff seven days later.

Plaintiff has been paid her wages and, thus, has no actual damages. Additionally, as to liquidated damages, this situation fits within the FLSA good faith exception clause. The Court, therefore, grants Defendant's motion as to Plaintiff's FLSA claim.

## C.     Civil Rights Act of 1964

### a.     Gender Discrimination

#### I.     Standard

It shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (2010).

---

3 These pages from the Reimbursement Letter provide evidence of notice from Defendant's former bank, Washington Mutual, on December 17, 2008, that Plaintiff attempted to deposit the checks. The notice also confirms the bank account was closed.

> To survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer."

*Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003). Alternatively, if a plaintiff cannot establish the workplace was permeated with discriminatory intimidation, she can establish that a single incident of harassment was "extraordinarily severe." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

> The starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's "supervisor." . . . Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim.

*Mack,* 326 F.3d at 123.

In *Meritor Sav. Bank, FSB v. Vinson*, the United States Supreme Court made "two things clear: employers are not always liable for the hostile work environment created by their employees . . . [a]nd, lack of notice and the existence of complaint procedures do not automatically insulate an employer from liability." *Karibian v. Columbia University*, 14 F.3d 773, 779 (1994) (citing *Meritor*, 477 U.S. 57, 72 (1986)). Beyond that, the Supreme Court "instructed [lower courts] to be guided by common law principles of agency." *Id.* (citing *Meritor*, 477 U.S. at 72).

"An employer may be held vicariously liable under Title VII when a supervisor creates a hostile work environment." *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)). The United States Supreme Court, in *Burlington Indus., Inc. v. Ellerth*, discussed "two different situations in which the employer and misbehaving employee have 'something more than the employment relation' sufficient to give

8

rise to vicarious liability." *Mack*, 326 F.3d at 124 (citing *Burlington*, 524 U.S. 742, 760 (1998)). The first situation, when "a supervisor takes a tangible employment action against the subordinate," is inapplicable in the present case.[4] The second situation—"[i]n cases in which 'supervisor harassment does not culminate in a tangible employment action' " (*id.* (quoting *Burlington*, 524 U.S. at 760))—applies herein. In such cases, "the employer is nonetheless subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate authority over the employee." *Burlington*, 524 U.S. at 765.

"An affirmative defense is available when the employer does not take any tangible employment action in connection with the harassment." *Leopold*, 239 F.3d at 245 (citing *Burlington*, 524 U.S. at 765).[5]

> This defense examines the reasonableness of the conduct of both the employer and the victimized employee. Specifically, the Supreme Court held that[:] the defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Leopold*, 239 F.3d at 245 (quoting *Faragher*, 524 U.S. at 807; *Burlington*, 524 U.S. at 765). Defendant "bears the burden of proving its affirmative defense." *Id.* "An employer need not prove success in preventing harassing behavior." *Id.* (holding, further, that, because the defendant "had in place an anti-harassment policy and an accompanying complaint procedure" defendant satisfied the employer prong of the affirmative defenses.).

---

4 Plaintiff does not contend that Will took a tangible employment action against her. Plaintiff does contend she was retaliated against, but that is a separate claim that is reviewed *infra*.

5 The Second Circuit defined tangible employment action as " 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " *Leopold*, 239 F.3d at 245, n.1 (quoting *Burlington*, 524 U.S. at 761).

"Vicarious liability . . . depends on whether the power—economic *or otherwise*, of the harassing employee over the subordinate victim given by the employer to the harasser—enabled the harasser, or materially augmented his or her ability, to create or maintain a hostile work environment." *Mack*, 326 F.3d at 125 (emphasis in original).[6] The *Mack* court concluded, therefore, that this power provided by the employer to the harasser makes the harasser a supervisor for Title VII purposes. *See id.* In *Mack*, these "less obvious" (*id.* at 124) supervisory powers included, specifically, the harasser being the senior employee at the work site[7] and "a remoteness from others with authority to exercise power on behalf of [Defendant]."[8] *Id.*

Thus, in defining "supervisor," the Second Circuit held that a supervisor does not merely make economics decisions concerning the victim, but "instead, whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates." *Id.* at 126 (noting that the Second Circuit applied a broader definition for "supervisor" than other circuit courts). Finally, as to *Mack*, the Second Circuit's test of supervisory power is an objective, not subjective, one. The test is not whether the harasser, or the victim, *thought* the harasser held supervisory power over the victim; rather, the test is whether the employer gave actual or *de facto* supervisory power to the offender. *See id.*[9]

In *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, the Second Circuit held "that the plaintiff must prove that the employer 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " *Karibian v. Columbia University*, 14 F.3d at

---

6 "It is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates." *Burlington*, 524 U.S. at 763.

7 "He therefore possessed a special dominance over [defendant])." *Id.*

8 "There was no one superior to [harasser] at [the work site]." *Id.*

9 *See, e.g.*, " . . . whether the authority *given* . . ." and the Court's use of the EEOC's definition of supervisor: "the individual *has* the authority." (emphases added)).

779 (citing *Kotcher*, 957 F.2d 59, 63 (2d Cir. 1992)). The Second Circuit ruled that the *Kotcher* holding applies to every hostile work environment case. *See Karibian*, 14 F.3d at 779 ("[Defendant argues] that the standard described in *Kotcher* governs an employer liability in this and *every* hostile work environment case. Again, [Defendant] has the better argument.") (emphasis in original).

Importantly, the *Karibian* Court notes further that "at some point the actions of a supervisor at a *sufficiently high level* in the hierarchy would necessarily be imputed to the company." *Id.* at 780 (citing *Kotcher*, 957 F.2d at 64) (emphasis added).

> In contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers; consequently, the *Kotcher* standard of employer liability will generally apply, and the employer will not be liable unless "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."

*Id.* (quoting *Kotcher*, 957 F.2d at 63).

In reversing the district court's grant of summary judgment, the Second Circuit held that the *Karibian* facts distinguished the case from *Kotcher*. *Id.* at 781. In *Kotcher*, "we simply applied the law of agency to the facts before us and concluded that liability for misconduct alleged could not be imputed to the employer. In [*Kotcher*], however, the harasser did [not] use his actual or apparent authority to further the harassment alleged." *Id.*

> If a plaintiff makes a prima facie case for vicarious liability, "a defending employer may raise an affirmative defense to liability or damages, subject to proof . . . [t]he defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington*, 524 U.S. at 765.

11

## II.        Motion Granted

Initially, the Court holds that a reasonable jury could find that Plaintiff surpasses the first *Mack* threshold: Plaintiff's "workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions her work environment." 326 F.3d at 122.[10] As to the second *Mack* threshold question, a reasonable jury could not conclude, however, that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Id.*

### 1.        Zach Will

#### i.        June 2008

The starting point for Title VII-vicarious liability is determining whether the harasser was a supervisor. *Id.* at 123. Will's actions do not pass the first *Burlington* test: Will did not take a tangible employment action against Plaintiff. 524 U.S. at 765. As to the second *Burlington* test, was Will a supervisor with immediate authority over Plaintiff? *Id.* If a reasonable jury could find Will was Plaintiff's supervisor, the second question, according to the Second Circuit's holding in *Karibian*, is whether a reasonable jury could find Will's supervisory powers were at a sufficiently high enough level to impute liability on Defendant. 14 F.3d at 780.

No reasonable jury could find Will was Plaintiff's supervisor. Defendant's chain-of-command is clear: Buffet Attendants are supervised by floors managers, maitre d', and management. Hayden Decl. ¶ 17. Wait staff are supervised by floors managers, maitre d', and management. *Id.* at ¶ 20. Assuming, *arguendo*, Will held some type of supervisory power over Plaintiff while he trained Plaintiff, Will was no longer training Plaintiff at the time of the

---

10 Even if a jury found that Plaintiff failed to surpass the first *Mack* threshold question, a reasonable jury could find, alternatively, that Will's actions and Lopez's actions, separately or *en masse*, were "extraordinarily severe" as to pass the *Cruz* threshold.

incidents; any supposed power terminated when training ended. *See, e.g.*, Pl.'s Dep., 34:3-13 (". . . there [were] six shifts or so that you were trained . . . [after which] you were expected to be able to handle yourself.") *see also id.*, 35:3-15 ("So is it fair to say that several weeks into your employment at [Defendant's] you were able to be a Buffet Attendant on your own without a trainer? . . . Yes.").

Plaintiff began her job in January 2008; the first incident did not occur until June 2008. *See* Pl.'s Third Am. Compl. ¶¶ 18, 21; *see also* Will Dep., 239:23-240:12, Jan. 21, 2011 ("So, you weren't showing her the ropes anymore, correct? [Correct.] You were just two co-workers working on a wedding on the date of the interaction; is that correct? [Correct.]"); *see also* Pl.'s Dep., 26:3-9 (noting Will trained her for approximately her "first six shifts."). During this training, Will assuredly "train[ed], review[ed] and comment[ed] on [Plaintiff's] performance . . . [and] directed [Plaintiff] to perform certain work assignments during her shifts . . . ." Will Decl. ¶¶ 6, 9. By the June 2008 incident, however, Will and Plaintiff were co-workers. Plaintiff admits Will was a buffet attendant on the date of the incident. Pl.'s Dep., 59:11-15 ("How many Buffet Attendants worked that full day? . . . . Me and [Will]."). Plaintiff argues Will was "bumped down to be a Buffet Attendant [from Wait Staff], because they didn't' need that many Wait Staff" that day. *Id.* at 59:23-60:3. Assuming, *arguendo*, this was the case, Wait Staff did not have supervisory power over buffet attendants. Hayden Decl. ¶ 20. No reasonable jury could find that Will held supervisory power over Plaintiff in June 2008.

The *Mack* court ruled that the harasser, although not an actual supervisor of Plaintiff, held *de facto* supervisory power because, as noted *supra* 10, the harasser was the senior employee at the work site and actual supervisors were not consistently present at the work site. 326 F.3d at 125. These intervening *Mack* factors are missing from the present set of facts. Supposing, *arguendo*, Will held some *de facto* supervisory power over Plaintiff, at least one actual

13

supervisor, Kevin Stollow, was on-duty at the time of the alleged incident. Pl.'s Dep., 60:21-25.[11]

Plaintiff's state-of-mind as to Will's supervisory power did not give Will supervisory power. Similarly, Will's state-of-mind did not give him supervisory power. Initially, "it is well-settled in this Circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citing *Miller v. Int'l Tel. & Tel. Corp.,* 755 F.2d 20, 24 (2d Cir. 1985)). The Court disregards, therefore, any statements in Will's declaration that contradict his own prior deposition testimony. *Arguendo*, the Court will review the declaration to illustrate further why a reasonable jury could not conclude Will was Plaintiff's supervisor. As noted, *supra* 10, the *Mack* test is an objective one: did Defendant give Will the power, or materially augment his ability, to create or maintain a hostile work environment? *Id.* Plaintiff notes that she "*considered* Will to be her direct supervisor." Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 13 (emphasis added). Plaintiff stated that, in her opinion, a supervisor is "somebody that you would go to for help or guidance." Pl.'s Dep., 109:13-19. Because Plaintiff believed Will would help or guide her, Plaintiff believed Will was her supervisor. *Id.* at 109:20-110:4. Will states that he "*believed* that [Defendant] gave me the authority to utilize my senior position over [Plaintiff], and exercise power on behalf of [Defendant]." Will Decl. ¶ 12, Pl.'s Opp'n Mot. Summ. J., Ex. C (emphasis added).

Defendant gave no such power to Will. Defendant's delegation procedures are quite clear: as noted, floor managers, maitre d', and management have supervisory power over buffet attendants and wait staff. *See, e.g.,* Hayden Decl. ¶ 17. Wait staff do not supervise buffet attendants. Will states that he could recommend Plaintiff's termination to Defendant. Will Decl. ¶ 11. Assuming, *arguendo*, Will could recommend termination, the "power" to recommend is

---

[11] Management and at least one of the owners was likely present, as well.

14

nowhere near sufficient evidence of supervisory power. In theory, any person—supervisor, co-worker, patron, person walking on the sidewalk beside Defendant's catering hall—could *recommend* an employee's termination. Recommending termination does not, *per se*, give way supervisory power over the recommendee.

While Will eventually took the test to become a "Captain," he did so on October 17, 2008. *See* "Special Advancement Test," Def.'s Mot. Summ. J., Ex. H. Will harassed Plaintiff in June 2008. Before October 17, Will was a buffet attendant and a waiter.[12] In Mid-July, Will began to *train* to become a Captain. Hayden Decl. ¶ 40. At that time, Will began to train to be given supervisory powers. The training, by definition, does not constitute the act: training for a marathon, does not make one a marathoner. During this training, Will was not a Captain and, therefore, he did not hold supervisory power over Plaintiff. Most importantly, this training occurred one month after the June 2008 harassment. In June 2008, Will was, undoubtedly, a waiter/buffet attendant who held no supervisory power over Plaintiff.

Beyond these facts, even if, *arguendo*, Will held some type of supervisory power over Plaintiff, the power held was at such a low level as to avoid imputing Defendant. Moreover, Will did not use his supervisory power, *arguendo*, to carry out the harassment. Before the freezer harassment, for example, Plaintiff states Kevin Stollow, maitre d' and manager, ordered Plaintiff and Will to garnish parfaits. *See* Pl.'s Dep., 85:8-13. Plaintiff states Will "told [Plaintiff] when we should go [garnish the parfaits]." *Id.* at 85:13. The supervisor—besides being (1) immediately available to Plaintiff if she decided to inform Defendant about the harassment and (2) her actual supervisor—told two of his buffet attendants to do a certain job; one of the two co-workers decided when to do it. Will did not use supervisory power to get Plaintiff into the freezer; they

---

[12] As noted, *infra*, Plaintiff presents no evidence of when exactly Will became a captain, but he was not a captain before this date.

were ordered there by their actual supervisor. "Where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers[.]" *Karibian*, 14 F.3d at 780.

Finally, even if Will was not Plaintiff's supervisor, the Second Circuit's precedent, as noted *supra*, holds that Defendant can still be held liable if "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Karibian*, 14 F.3d at 780 (quoting *Kotcher*, 957 F.2d at 63). As to knowledge, Plaintiff does not allege Defendant knew about the harassment before October 22, 2008. As to reasonability, Defendant had a formal anti-sexual harassment policy in place at the time of the incidents, which stated, in part, that "any employee who feels that he or she has been subjected to sexual harassment should immediately report the matter to the Supervisor, Personnel Director, or one of the Owners." Hayden Decl., Ex. A at 3. Plaintiff states that Will "testified that [he was] unfamiliar with Defendant's sexual harassment policy." Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 3. Will acknowledged, however, that he did, in fact, read Defendant's employee manual, which included Defendant's "Policy on Sexual Harassment." Hayden Decl., Ex. B. Plaintiff signed an identical acknowledgement when she began working for Defendant. *See id.*, Ex. A. This shows additionally that Defendant satisfies the employer prong of the *Burlington* affirmative defense test: Defendant clearly "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." 524 U.S. at 765.[13]

Plaintiff argues that "Defendant's policy does not address to whom [Plaintiff] should complain in circumstances where the Supervisor is the individual engaging in the lawful

---

13 As noted, *supra* 9, Defendant "need not have to prove success in preventing harassing behavior." *Leopold*, 239 F.3d at 245.

harassment." Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 3. Initially, the Court has found no reasonable jury could find Will was Plaintiff's supervisor at the time of the incidents; Plaintiff's dilemma, therefore, is not a valid one. Nonetheless, Plaintiff's argument is an interesting one: if Plaintiff did believe, subjectively, Will was her supervisor, to whom should Plaintiff have spoken? The answer is an easy one: floor managers or maitre d' ("Supervisors"), the Personnel Director, or one of the Owners. All are clearly labeled alternatives in Defendant's sexual harassment policy. Plaintiff knew who they were: she met Anne Hayden and Kevin Stollow on her first day of work and, as noted *supra*, Stollow was on-duty the day of the harassment. Pl.'s Dep., 21:23-22:12; *id.* at 60:21-25.[14] Plaintiff admits that she read and she understood Defendant's sexual harassment policy when she was hired. Pl.'s Dep., 36:10-39:24. Defendant's harassment policies were reasonable and clear; while Plaintiff felt, understandably, fearful and ashamed after the harassment (*see, e.g.,* Pl.'s Dep., 101:22-23), her feelings do not impute liability onto Defendant.

The above-referenced options are akin to this Court's ruling that this case is factually-distinguished from the *Mack* holding. *See supra* 13-14. As noted, the Second Circuit held in *Mack*, specifically, that the harasser being the senior employee at the work site and the "remoteness from others with authority to exercise power on behalf of [Defendant]" were the defining factors in making her harasser a *de facto* supervisor for sexual harassment purposes. *See Mack*, 326 F.3d at 125. Plaintiff did not have these concerns. Plaintiff's actual supervisors (floor managers and maitre d') were listed on the sheet that employees sign-onto at the beginning of each shift. *See* Pl.'s Dep., 33:5-34-1 ("[The sign-in sheet] . . . would have . . . [the captain and] . . . the Maitre d' . . . ."). For Plaintiff, there was no remoteness from actual supervisors. Plaintiff

---

[14] In her deposition, Plaintiff admits she spoke to Stollow often about personal issues. *See, e.g.,* Pl.'s Dep., 62:23-67:7 ("Did you feel comfortable speaking to [Stollow]? Yes.") Plaintiff knew Stollow was available to meet with her and, clearly, she trusted him.

had daily opportunities to inform her actual supervisors or management about the incident.

Defendant's Director of Human Resources, Ann Hayden, states that she held quarterly meetings with wait staff and buffet attendants. *See* Hayden Decl. ¶ 9. Assuming, *arguendo*, that one of these meetings was held, at the latest, one day prior to the June 2008 incident, the next meeting would have occurred in September 2008. Plaintiff did not take this opportunity to inform Hayden about the incident. Moreover, Plaintiff admits she did not inform management until October 2008 and, instead, informed two, non-supervisory co-workers. Pl.'s Dep., 183:24-184:3 ("is [October 22, 2008] the first time that you told anyone in management at [Defendant's] about the incident with Zach Will? Yes."); *see also id.*, 197:14-16 ("I complained to [Will] every time that he did something. But I never told [Hayden] or [Stollow] what had happened."). Plaintiff even stated at her deposition that she did not believe Defendant knew about Will's harassment. Pl.'s Dep., 244:17-24. Informing co-workers does not amount to informing actual supervisors or management. As such, no reasonable jury could conclude that Defendant failed to provide a "reasonable avenue for complaint or knew of the harassment but did nothing about it." *Karibian*, 14 F.3d at 779.

Finally, as to the harassment in Will's car, Defendant satisfies the employee prong of the *Burlington* affirmative defense test: "the plaintiff employee unreasonably failed . . . to avoid harm otherwise." *Burlington*, 524 U.S. at 765. Plaintiff admitted that her parents and other co-workers besides Will had taken her home after work. *See, e.g.*, Pl.'s Dep., 51:16-18 ("If it wasn't too late, [my mom] would come pick me up."); *see also id.*, 52:8-21 (noting that, besides her mother and Will, the Delvalle sisters, Joe Berdini, and Erica Kelty drove Plaintiff home after work). There is no reason Plaintiff had to get into Will's car after the harassment through which he put her in the freezer. Assuming Plaintiff did not want to tell anyone about the harassment, Plaintiff could have called her mother, or asked another co-worker, besides Will, to drive her

home. Plaintiff contends that Will "informed [Plaintiff] that he would be driving [Plaintiff] home." Pl.'s Third Am. Compl. ¶ 23. This contention does not match Plaintiff's deposition testimony, wherein Plaintiff makes clear that *she* "would ask somebody that [she] was working with" to drive her home. Pl.'s Dep., 51:25-52:2. Plaintiff admits she is the one who freely chooses to ask co-workers for a ride. Even supposing, *arguendo*, Will "informed" Plaintiff that he was driving, clearly Plaintiff knew she did not need to listen to Will. Plaintiff decision to enter Will's car, and the harassment she underwent therein, may not be imputed onto Defendant.

In sum, as to the June 2008 incidents involving Will, no reasonable jury could find a basis for imputing Will actions onto Defendant.


### ii.      July 2008 and October 2008

As noted, *supra* 2, Plaintiff's Third Amended Complaint alleges that, in July 2008, Will "continued his sexually charged advances toward Plaintiff . . . [by] consistently sen[ding] Plaintiff text messages and flirt[ing] with her at work[.]" Third Am. Compl. ¶¶ 26-27. Further, in October 2008, "Will caressed Plaintiff's legs in a suggestive manner several times while at work. Plaintiff immediately told [Will] to stop and not to touch her. Will responded that Plaintiff 'liked it.' " *Id.* at ¶ 28. Will stated, in front of Plaintiff's co-workers, that Will " 'did not know Plaintiff had that much of an ass.' " *Id.* at ¶ 29.

Initially, Defendant—having satisfied previously the *Burlington* employer prong—satisfies the employee prong of the *Burlington* affirmative defense test: "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by [Defendant] or to avoid harm otherwise." *Burlington*, 524 U.S. at 765. Besides failing to inform Defendant about the June 2008 harassments, Plaintiff did not even merely ask Defendant to avoid scheduling the two for the same dates or events. Plaintiff concedes that Defendant was not

19

informed about Will's actions until October 22, 2008. Plaintiff, thus, failed to take advantage of an opportunity to stop additional harassment by Will. Therefore, Defendant's motion, as related to Will's July 2008 and October 2008 harassments, is granted. These claims fail for additional reasons as well.

First, Will was not a supervisor in July 2008, thus, Defendant is not vicariously liable for any July 2008 actions. Second, Plaintiff presents no evidence, and does not even explicitly state, that Will's alleged October 2008 harassments took place *after* Will took the captain's test. Plaintiff presents no evidence regarding the date when Will became a captain, though, as noted *supra* n.12, it did not occur prior to October 17, 2008. On October 22, 2008, Defendant held a meeting with Plaintiff's parents, at which time Plaintiff's parents informed Defendant about Will's harassment. *See* Decl. Zabell, Pl.'s Opp'n Def.'s Mot. Summ. J., Ex. L 1-3 (the "Reports"). On October 24, 2008, the parties, and Plaintiff, met again to discuss the harassment. *See id.* at 4-9 (collectively, "the Meetings"). At no time during the Meetings did Plaintiff discuss the July 2008 or October 2008 allegations. Beyond the four paragraphs in the Third Amended Complaint, and their restatement in Plaintiff's opposition papers, no evidence, nor even additional discussion, has been presented to the Court about those alleged harassments. *See Chambers*, 43 F.3d at 37 (no evidence with which the Court can make a reasonable inference). In her opposition papers, Plaintiff never argues that the Reports are incomplete or that these allegations are deliberately left out. Plaintiff does not contend these allegations were ever discussed at any time; Plaintiff simply alleges them. Considering the October event allegedly happened within weeks, at most, of the Meetings, why did Plaintiff fail to mention it during the Meetings? Moreover, as noted, Plaintiff presents no evidence that the alleged October 2008 incidents occurred on or after October 17, 2008 (when Will took the captain's test). As the Second Circuit has ruled, "When the [summary judgment] motion is made, we go beyond the

20

paper allegations of the pleadings . . . [as] the time has come to put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citing Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* 150 (2d ed. 1977)). "Accordingly, unsupported allegations do not create a material issue of fact." *Id.* (citing *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)). Plaintiff has failed to "put up" any evidence that the alleged October 2008 harassment happened after Will became a Captain and, thus, the unsupported allegations do not create a material issue of fact. If the alleged harassment took place before that date, Will was not a supervisor and, thus, Defendant is not vicariously liable.

Altogether, no reasonable jury could impute supervisory liability onto Defendant for the July 2008 and October 2008 incidents.

### 2.    Alex Lopez[15]

A reasonable jury could not conclude that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Id.* Plaintiff does not contend that Lopez held any supervisory power over her. Plaintiff stated that Lopez sexually harassed Plaintiff in early September 2008. Pl.'s Third Am. Compl. ¶ 31; *see also* Zabell Decl., Pl.'s Opp'n Mot. Summ. J., Ex. K. Plaintiff did not inform Defendant until October 22, 2008. *See* Zabell Decl., Ex. K. Plaintiff admits Defendant did not have knowledge of the incident until

---

15 Plaintiff alleges, outside of the Third Amended Complaint, that three porters sexually harassed her as well. *See, e.g.*, Pl.'s Dep., 186:18-196:10; *see also* Pl.'s Letter. Plaintiff fails, however, to include any such allegations in her Third Amended Complaint. As such, these claims are outsides the bounds of the case. Furthermore, (1) Plaintiff did not tell her supervisors about the alleged incident (Pl.'s Dep., 195:11-25), (2) the porters were not Plaintiff's supervisor (*id.* at 196:8-10), and (3) Plaintiff does not claim her alleged constructive terminated occurred because of the porters (*id.* at 225:19-22 (". . . I couldn't go back to work [b]ecause *they both* [Lopez and Will] weren't fired . . . .")). Finally, Plaintiff could provide no details about the harassers' identity, nor any other information to support her claim. As noted, "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41.

that time. Defendant's reasonable complaint procedures were in place at the time of the Lopez

incidents. As with the Will harassment, Plaintiff understandable desire to keep quiet about the

harassment (and her equally understandable feeling of being "thrown off balance" by the

harassment (Pl.'s Dep., 169:14)) does not impute supervisory liability onto Defendant. Besides

the fact that Lopez was not Plaintiff's supervisor, no reasonable jury could conclude that

Defendant failed to provide a "reasonable avenue for complaint or knew of the harassment but

did nothing about it." *Karibian*, 14 F.3d at 779.

### b.    Retaliation

### I.    Standard

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . because [s]he has opposed any practice made an
> unlawful employment practice by this subchapter, or because he has made a
> charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) (2010).

The Court analyzes federal retaliation claims under the *McDonnell Douglas* burden-

shifting approach. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *see also*

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). "First, the plaintiff must establish a

prima facie case of retaliation." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712,

720 (2d Cir. 2010).[16] "To carry that burden, the plaintiff 'must show that: (1) [she] engaged in a

protected activity; (2) [her] employer was aware of this activity; (3) the employer took adverse

employment action against [her]; and (4) a causal connection exists between the alleged adverse

action and the protected activity.' " *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409,

---

16 Although *Fincher* was a retaliation claim brought under 42 U.S.C. § 1981, the Second Circuit
noted that § 1981 and Title VII retaliation claims are analyzed under the same three-step burden
shifting analysis.

410-11 (2d Cir. 2011) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006); *see also Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).

"Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim." *Fincher*, 604 F.3d at 721 (quoting *Thomlison v. Sharp Elecs. Corp.*, No. 99 Civ. 9539, 2000 WL 1909774, at *4 (S.D.N.Y. Dec. 18, 2000)); *see also Mathirampuzha*, 548 F.3d at 78 ("An adverse employment action is 'a materially adverse *change* in the terms and conditions of employment.' " (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (emphasis in original)).

"If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher*, 604 F.3d at 720. "If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Id.*

"Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.' " *Fincher*, 604 F.3d at 725 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). "This standard is higher than the standard for establishing a hostile work environment." *Id.* (citing *Suders*, 542 U.S. at 147).

## II.     Motion Granted

Plaintiff established, clearly, the first two parts of the test: (1) she engaged in a protected activity (alerting her employer about the sexual harassment) and (2) her employer was aware of her protected activity. Plaintiff, however, presents no evidence of retaliatory activity. Plaintiff

argues the October 2, 2008 and October 9, 2008 bounced pay checks illustrate that Defendant retaliated against her. *See* Pl.'s Third. Am. Compl. ¶¶ 38-46. Assuming, *arguendo*, this passes the first *McDonnell Douglas* prong, Defendant has articulated a legitimate, non-retaliatory reason for its actions. As noted, *supra* subsection **B(b)**, Defendant presents evidence that it changed banks in fall 2008 and that, upon learning of the bounced checks, it immediately sent Plaintiff new checks and compensated Plaintiff for the bank fees associated with the original, bounced checks. Plaintiff admitted receiving full payment, and repayment for related fees, from Defendant. *See* Pl.'s Dep., 209:4-9. Plaintiff fails to meet her burden to show that retaliation was a substantial reason for the bounced checks. As such, Defendant's motion as to the bounced check-related retaliation claim is granted.

Plaintiff admits that Defendant did not officially terminate her employment. *See* Pl.'s Dep., 138:11-21. Rather, Plaintiff complains of constructive termination based upon Defendant's failure to fire Lopez. After the Meetings, Defendant met with Will to discuss the harassment. *See, e.g.*, Hayden Dep., 19:12-21:11, May 20, 2010. Will admitted to Hayden that Will "expos[ed] himself to [Plaintiff]." *Id.* at 19:12-20:16. At the conclusion of this discussion, Defendant suspended Will; by the end of that same day, Defendant terminated Will's employment. *Id.* at 22:19-22 ("So after Zach Will admitted to you that he sexually harassed [Plaintiff], you suspended him; is that correct? Yes."); *id.* at 23:4-17 ("And then after discussing it with Kevin Stollow and Filomena Lombardi[], the decision was made to terminate Mr. Will; is that correct? Yes."). Defendant immediately spoke to Will about the then-allegations; Will admitted the harassment. Because Defendant had confirmed Plaintiff's allegations, Defendant fired Will.

Similarly, Defendant interviewed Lopez as part of their investigation. Hayden Dep., 29:4-6.[17] "Lopez denied having any inappropriate conduct with [Plaintiff]." *Id.* at 33:15-17. Defendant did not fire Lopez, at that time, because "there were no witnesses to either side['s version], so there [were] no findings. There was no date. There was no time." *Id.* at 33:22-24. Hayden states she did not believe one employee over the other because "that's not my place. My place is to investigate and treat each employee the same way." *Id.* at 36:15-17. Further, "Lopez [was] an employee also. And if there's someone accusing him of something and there's no proof of those findings, then I believe I did my job." *Id.* at 36:22-25.

The different outcomes occurred, clearly, because Will admitted his guilt, while Lopez did not admit his guilt. Plaintiff admitted that this was the reason Lopez was not fired. Pl.'s Dep., 202:19-21 ("They fired one because he admitted it. They didn't fire Alex [Lopez] because he didn't admit it."). Defendant could not simply fire Lopez because Plaintiff alleged harassment. Beyond the allegation, Defendant had no grounds upon which to fire Lopez. Plaintiff presents no evidence of how Defendant's action was retaliatory.

Additionally, Plaintiff does not meet the *Fincher* standard for retaliation. Plaintiff fails to show how working conditions would have been "so intolerable that a reasonable person would have felt compelled to resign." *Fincher*, 604 F.3d at 725 (citing *Suders*, 542 U.S. at 147).[18] Plaintiff could have requested, for instance, that Defendant not schedule Lopez for any of Plaintiff's shifts. If Defendant refused, perhaps a reasonable jury could find constructive discharge therein.[19] Relatedly, Plaintiff's retaliation claim fails because Plaintiff's "situation in

---

[17] Although Lopez did not speak English, another employee, bilingual Victor Chacon, translated at the interview. *Id.* at 29:8-10.

[18] As noted *supra*, "This standard is higher than the standard for establishing a hostile work environment." *Id.* (citing *Suders*, 542 U.S. at 147).

[19] By scheduling Plaintiff and Lopez for different days or times, Defendant would not have harmed Lopez's rights as an employee.

the wake of her having made the complaint [was] the same as it would have been had she not brought the complaint." *Fincher*, 604 F.3d at 721. Defendant did not take any affirmative action to punish her: *i.e.*, Plaintiff's workplace environment did not *change* as a result of her protected activity. *See id.*; *see also Mathirampuzha*, 548 F.3d at 78. Indeed, if she did not tell Defendant about the Lopez harassment, Plaintiff's work environment would have been the same as it was after she did tell Defendant: she and Lopez both would have been employees.

In sum, no reasonable jury could conclude that Defendant retaliated against Plaintiff for her protected activity.


## D.   Pendent State Law Claims

### a.   Standard

Where federal claims are dismissed before trial, State law claims should be dismissed as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1996); *see also Grace v. Rosenstock*, 228 F.3d 40, 55 (2d Cir. 2000).


### b.   Plaintiff's State Law Claims are Dismissed

The Court has wholly granted the Defendant's motions for summary judgment as to Plaintiff's federal claims; the Court declines to exercise supplemental jurisdiction over Plaintiff's State law claims.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's Federal law claims and the Court declines to exercise supplemental jurisdiction over Plaintiff's State law claims.[20]

**SO ORDERED.**

_____
Thomas C. Platt, U.S.D.J.

Dated: November  9 , 2011
           Central Islip, New York

---

20 The parties should in no way conclude that this Order justifies or condones the harassment of Plaintiff. No person should be subjected to actions such as those detailed above. Companies need to protect their employees, most especially underage employees, from harassment and to ensure any harassment is quickly addressed.

27